THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

**JUAN CORCHADO MERCADO,
BRUNILDA GONZÁLEZ, on their own
right and on behalf of their son JOSÉ
CORCHADO GONZÁLEZ,**

    **Plaintiffs,**

v.

**HOSPITAL CAYETANO COLL Y TOSTE,
et al.,**

    **Defendants.**

**Civil No. 07-1607 (ADC)**

## OPINION AND ORDER

Plaintiffs, Juan Corchado-Mercado, Brunilda-González, on their own and on behalf of their son, José Corchado-González (collectively "plaintiffs"), filed a complaint against, *inter alia*, Hospital Cayetano Coll y Toste, and Continental Casualty Company, Inc. ("CCC") (collectively "defendants"), and others, pursuant to the Emergency Medical Treatment and Active Labor Act ("EMTALA"), 42 U.S.C. § 1395dd, as well as supplemental Commonwealth of Puerto Rico ("Commonwealth") laws. **Docket No. 32**. Now before the court is defendants' motion for summary judgment, statement of uncontested material facts, memorandum in support thereof, and reply brief, as well as plaintiffs' opposition to defendants' summary judgment motion and opposing statement of material facts. **Docket Nos. 61, 61-2, 61-16, 68, 65, 65-2**. At issue is whether plaintiffs' allegations and proffered evidence support an EMTALA cause of action against defendants.

I.   **Factual Background**

Unless otherwise noted, the following relevant facts are derived from the parties' statements of fact. **Docket Nos. 61-2, 65-2**. Consistent with the summary judgment standard, the court states the facts in the light most favorable to plaintiff, the nonmoving party. *See*

*Iverson v. City of Boston*, 452 F.3d 94, 98 (1st Cir. 2006).

Hospital Cayetano Coll y Toste is subject to the EMTALA provisions. **Docket No. 61-2,** at ¶ 1; **Docket No. 65-2,** at ¶ 1. On June 4, 2006, José Corchado-González ("Corchado" or "the patient"), who was 19 years old at the time, was involved in a motorcycle accident, and arrived to the Emergency Room of Hospital Cayetano Coll y Toste, via ambulance, at around 8:24 p.m. *Id.*, at ¶ 2; *Id.*, at ¶ 2. Corchado was immediately triaged. His chief complaint was multiple traumas, due to a motorcycle accident. His vital signs at the time were T 35.6EC, P 82, R 19, BP 146/95, and O$_2$ Saturation of 97%. The patient's condition was categorized as an emergency, and he was placed at the trauma room. *Id.*, at ¶ 3; *Id.*, at ¶ 3.

At 9:10 p.m., Corchado was evaluated by Dr. Héctor Ramírez ("Dr. Ramírez"), who took the medical history and performed a physical evaluation. Dr. Ramírez noted on the medical record "Trauma" as the patient's complaint; and "Left ankle trauma" as the chief complaint. *Id.*, at ¶ 4; *Id.*, at ¶ 4. Under History of Illness, Dr. Ramírez referred that the patient was a 19 year old male who received trauma to left leg and ankle in a motorcycle accident when hit by a car. Upon physical examination, Dr. Ramírez noted normal findings regarding the patient's head, ears, eyes, nose and throat (HEENT), lungs, heart and abdomen. Regarding the patient's extremities, Dr. Ramírez reported left leg swelling, open wound and bleeding, peripheral pulses present with adequate capillary filling. *Id.*, at ¶ 5; *Id.*, at ¶ 5. Dr. Ramírez made a provisional diagnosis of Left Ankle Trauma and Left Leg Trauma, and placed several orders for treatment, including R/L (Ringer's Lactate) 1000 ml to run 150 ml/hr, Nubain 10 mg IM (intramuscular), Ancef 2 gm IV (intravenous), Tetanus Toxoid Vaccine, CBC, Left leg X-Ray; and Left ankle X-Ray. The nurses took and executed the orders at 9:20 p.m. *Id.*, at ¶ 6; *Id.*, at ¶ 6.

On June 4, 2006, at 11:38 p.m., Dr. Ramírez ordered the patient be given Decadron and Vistaryl. Said orders were taken and executed by the nurses at 11:55 p.m. *Id.*, at ¶ 7; *Id.*, at

¶ 7.  At 12:00 a.m. on June 5, 2006, the nurses took the patient's vital signs, which were T 36.5EC, P 81, R 19, BP 145/87.  *Id.*, at ¶ 8; *Id.*, at ¶ 8.

At 1:10 a.m., Dr. Ramírez placed several medical orders, including various laboratory tests (PT & PTT, CBC, BMP and Type & Screen), placement of a posterior cast, and to close wound. These orders were taken and executed shortly thereafter. *Id.*, at ¶ 9; *Id.*, at ¶ 9.  At 3:50 a.m., Dr. Ramírez placed another set of orders, including posterior cast, Demerol and Ancef. The orders were taken and executed shortly thereafter. *Id.*, at ¶ 10; *Id.*, at ¶ 10.  At around that time, Dr. Ramírez also discussed and arranged the transfer of the patient with Dr. Hernández at the Puerto Rico Medical Center's Emergency Department, who accepted the transfer.  At 3:51 a.m., Dr. Ramírez completed the transfer form and marked the benefits of the transfer, which included continuity of stabilization, diagnosis with specific resources not presently available, and specialized treatment for the patient's condition.  *Id.*, at ¶ 11; *Id.*, at ¶ 11.  At 3:53 a.m., Dr. Ramírez completed the referral form for the transfer of patient to the Puerto Rico Medical Center.  Dr. Ramírez noted that the patient had left leg trauma, that he was active, alert and oriented in person, time and place (AAOx3), that he had a posterior cast on his left leg, and a closed wound by approximation.  The patient's vital signs at the time were T 36.5°C, P 104, R 20, and BP 115/76.  *Id.*, at ¶ 12; *Id.*, at ¶ 12.  The patient's mother, Brunilda González, signed the consent for transfer to Puerto Rico Medical Center and other transfer documents at around 4:08 a.m. *Id.*, at ¶ 13; *Id.*, at ¶ 13.  Shortly thereafter, the patient was transported, via land ambulance, to the Puerto Rico Medical Center.  The patient's mother accompanied him during the transfer.  *Id.*, at ¶ 14; *Id.*, at ¶ 14.

Corchado arrived to the Emergency Department of the Puerto Rico Medical Center in stable condition at around 5:30 a.m.  He was classified as priority GREEN.  His main complaint was trauma on his left foot; and the record notes that the patient brought with him the X-Rays taken at Hospital Cayetano Coll y Toste. *Id.*, at ¶ 15; *Id.*, at ¶ 15.  The patient's vital signs upon arrival to the Puerto Rico Medical Center were T 36.3°C, P 112, R 20, and BP

139/77; and he was alert and oriented in person, time, place and space. *Id.*, at ¶ 16; *Id.*, at ¶ 16.

Shortly after his arrival at the Emergency Room of the Puerto Rico Medical Center, the patient was evaluated by Dr. Amaury Hernández, who was the physician that had accepted the transfer. After evaluating the patient, Dr. Hernández placed several medical orders, including a consultation to Orthopedics. *Id.*, at ¶ 19; *Id.*, at ¶ 19. Shortly thereafter, an Orthopedist evaluated the patient, and ordered his admission to their services on June 5, 2006 at 6:30 a.m. *Id.*, at ¶ 20; *Id.*, at ¶ 20. On July 16, 2006, after several surgeries, the patient underwent a below knee amputation of his left leg. *Id.*, at ¶ 21; *Id.*, at ¶ 21.

The Puerto Rico Medical Center is the only level one trauma center in Puerto Rico. *Id.*, at ¶ 22; *Id.*, at ¶ 22. There is a shortage of Orthopedic Surgeons in Puerto Rico. *Id.*, at ¶ 23; *Id.*, at ¶ 23. On June 4, 2006, there were no on-call Orthopedic Surgeons available at Hospital Cayetano Coll y Toste to tend to orthopedic emergencies. *Id.*, at ¶ 24; *Id.*, at ¶ 24.

### III.   **Summary Judgment Standard**

"Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law based on the pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits." *Thompson v. Coca-Cola Co.*, 522 F.3d 168, 175 (1st Cir. 2008) (citing Fed. R. Civ P. 56(c)). When ruling on a motion for summary judgment, the court "must scrutinize the evidence in the light most agreeable to the nonmoving party, giving that party the benefit of any and all reasonable inferences." *Cox v. Hainey*, 391 F.3d 25, 27 (1st Cir. 2004). The court may safely ignore "conclusory allegations, improbable inferences, and unsupported speculation." *Suárez v. Pueblo Int'l, Inc.*, 229 F.3d 49, 53 (1st Cir. 2000) (quoting *Medina-Muñoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990)). In addition, the "absence of evidence on a critical issue weighs against the party—be it either the movant or nonmovant—who would bear the burden of proof on that issue at trial." *Alamo-Rodríguez v. Pfizer Pharma.*, 286 F. Supp. 2d 144, 151 (D.P.R. 2003) (citing *Pérez v. Volvo Car Corp.*, 247 F.3d 303, 310 (1st Cir. 2001)).

"A dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party." *Thompson*, 522 F.3d at 175 (quoting *Sánchez v. Alvarado*, 101 F.3d 223, 227 (1st Cir. 1996)) (internal quotation marks omitted). "A fact is material if it has the potential of determining the outcome of the litigation." *Maymí v. P.R. Ports Auth.*, 515 F.3d 20, 25 (1st Cir. 2008). To defeat a properly supported motion for summary judgment, evidence offered by the non-movant "must be significantly probative of specific facts." *Pérez*, 247 F.3d at 317 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). As a rule, "[e]vidence that is inadmissible at trial, such as inadmissible hearsay, may not be considered on summary judgment." *Vázquez v. López-Rosario*, 134 F.3d 28, 33 (1st Cir. 1998). Finally, it is well settled that "[t]he mere existence of a scintilla of evidence" is insufficient to defeat a properly supported motion for summary judgment. *Anderson*, 477 U.S. at 252.

## IV.   Statutory Scheme

Congress enacted EMTALA in 1986 in response to concerns that certain medical facilities were "dumping" uninsured and/or indigent patients. *See Fraticelli-Torres v. García-Rivera*, 550 F. Supp. 2d 251 (D.P.R. 2007), *aff'd by Fraticelli-Torres v. Hosp. Hermanos*, 300 Fed. Appx. 1 (1st Cir. 2008)(unpublished opinion); *see also Summers v. Baptist Med. Ctr. Arkadelphia*, 91 F.3d 1132, 1136 (8th Cir. 1996) (purpose of EMTALA is "to address a distinct and rather narrow problem-the 'dumping' of uninsured, underinsured, or indigent patients by hospitals who did not want to treat them"). "The Act created a new cause of action, separate from traditional state medical malpractice." *Fraticelli-Torres*, 550 F. Supp. 2d at 254 .

EMTALA has two linchpin provisions. First, participating hospitals must provide appropriate screening to individuals who come to its emergency department. Second, they must provide the services necessary to stabilize the patient's condition before release or transfer. *Id.* at 254 (citing *Álvarez-Pumarejo v. Mun. of San Juan*, 972 F. Supp. 86, 87 (D.P.R. 1997); *Correa v. Hosp. San Francisco*, 69 F.3d 1184, 1190 (1st Cir. 1995)). EMTALA, however,

"does not require a hospital to provide a uniform or minimal level of care to every patient seeking emergency care and does not provide a cause of action for misdiagnosis or improper medical treatment." *Id.* (citing *Feighery v. York Hospital,* 59 F. Supp. 2d 96, 102 (D.Me. 1999)). These areas are left to be dealt with pursuant to state malpractice laws.

Thus, "[t]he purpose of EMTALA is to bridge the gap not covered by state malpractice laws and to ensure that there be "some screening procedure, and that it be administered even-handedly." *Id.* (quoting *Correa*, 69 F.3d at 1192). "A mere failure to provide medical treatment consistent with generally accepted medical standards is actionable under state tort law." *Torres-Otero v. Hospital General Menonita,* 115 F. Supp. 2d 253, 260 (D.P.R. 2000); *Feighery,* 59 F. Supp. 2d 102 (hospital is not required "to provide a uniform minimum level of care" and does not provide "a private cause of action . . . for misdiagnosis or improper medical treatment"). In the event a hospital violates EMTALA, it is subject to civil penalties, 42 U.S.C. § 1395dd(d)(1), and private rights of action, 42 U.S.C. § 1395dd(d)(2).

**V.     Discussion**

   **1.     Duty to Screen**

Defendants move to dismiss plaintiffs' claim that defendants failed to properly screen under EMTALA, arguing that defendants performed the proper medical screening evaluation, reasonably calculated to identify Corchado's condition. **Docket No. 61-16**, at 5-8. Plaintiffs oppose dismissal, countering that the screening process was defective

EMTALA's screening requirement requires participating hospitals to provide to anyone who comes to the emergency department and requests examination or treatment "an appropriate medical screening examination within the capability of the hospital's emergency department, including ancillary services routinely available to the emergency department," to determine whether or not an emergency medical condition exists. 42 U.S.C. § 1395dd(a). Although the statute does not provide a definition of what constitutes "appropriate" medical screening, the First Circuit has stated that the "essence of this requirement is that there be

some screening procedure, and that it be administered even-handedly." *Correa*, 69 F.3d at 1192. Therefore, participating hospitals fulfill this duty if they provide "for a screening examination reasonably calculated to identify critical medical conditions that may be afflicting symptomatic patients and provide that level of screening uniformly to all those who present substantially similar complaints." *Id*. Since EMTALA does not create a cause of action for medical malpractice, a faulty screening does not contravene the statute, whereas a refusal to follow regular screening procedures, disparate screening or simply refusing to screen at all does. *Id.* at 1192-1193.

The undisputed facts of the case hold that Corchado arrived via ambulance to defendant's emergency room at around 8:24 p.m. and he was immediately triaged. His chief complaint consisted of multiple traumas due to a motorcycle accident and his vital signs at the time were T 35.6°C, P 82, R 19, BP 146/95, and $O_2$ Saturation of 97%. Corchado's condition was categorized as an emergency, and he was placed in the trauma room. Thereafter, at 9:10 p.m., Dr. Ramírez evaluated Corchado, took his medical history and performed a physical evaluation, noting on the medical record "Trauma" as the patient's complaint and "left ankle trauma" as the Chief Complaint. Under EMTALA's screening provision, the court need satisfy itself that the hospital in fact provided screening that was "reasonably calculated to identify critical medical conditions" for the plaintiff's emergency room visit. *See Del Carmen Guadalupe v. Negrón*, 299 F. 3d 15, 20 (1st Cir. 2002) *see also Correa*, 69 F.3d at 1192.

Here, it is uncontested that, upon arrival to the emergency room, Corchado was triaged, examined and diagnosed, first by the hospital's personnel in the emergency room and later by Dr. Ramírez in the trauma room. Further, plaintiff has not provided any facts to adduce a failure to screen, disparate screening or failure to identify or diagnose the medical condition that promoted Corchado's emergency room visit. *See Del Carmen Guadalupe,* 299 F.3d at 19 (noting that "what EMTALA prohibits is disparate treatment or no treatment at all")(citation and internal quotations omitted). Aside from stating that Corchado waited 40

minutes to be examined by Dr. Ramírez, Corchado has not shown that the screening he received failed to comply with the standard screening policy that the hospital follows for other patients with substantially similar conditions. *Vázquez-Rivera v. Hosp. Episcopal San Lucas, Inc.*, 620 F. Supp. 2d 264, 269 (D.P.R. 2009)("A plaintiff must show that the screening the he or she received failed to comply with the standard screening policy that the hospital regularly follows for other patients presenting similar conditions.")(internal quotations and citations omitted).. Consequently, the court finds that the defendant Hospital Cayetano Coll y Toste complied with EMTALA's screening provision.

### 2.    Duty to Stabilize

Next, defendants aver that it complied with its duty to stabilize Corchado before transferring him to the Puerto Rico Medical Center to receive specialized orthopedic care. **Docket No.**, at 9. Plaintiffs oppose, arguing that Corchado had not been stabilized under EMTALA. After conducting a review of the applicable law and the record, the court agrees with defendants.

EMTALA requires covered hospitals to "stabilize" any patient if it "determines that the individual has an emergency medical condition." 42 U.S.C. § 1395dd(b)(1). Stabilization requires "such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility. . . ." *Id.* at § 1395dd(e)(3)(A). Transfer means "the movement (including the discharge) of an individual outside a hospital's facilities at the direction of any person employed by (or affiliated or associated, directly or indirectly, with) the hospital . . . ." 42 U.S.C. § 1395dd(e)(4).

Hence, the duty to stabilize only applies to patients who, suffering from an emergency medical condition, are transferred (or discharged) away from the treating hospital. *See Correa*, 69 F.3d at 1190 ("To establish an EMTALA violation, a plaintiff must show that . . . the hospital bade farewell to the patient (whether by turning her away, discharging her, or improvidently

transferring her) without first stabilizing the emergency medical condition."); *Álvarez-Torres v. Ryder Mem'l Hosp., Inc.*, 576 F. Supp. 2d 278, 284-85 (D.P.R. 2008), *aff'd by Álvarez-Torres v. Ryder Mem. Hosp., Inc.*, 582 F. 3d 47, 52 (1st Cir. 2009); *Estate of Félix Giomard Rivera v. Doctor Susoni Hosp.*, 288 F. Supp. 2d 161, 165 (D.P.R. 2003); *Marrero v. Hosp. Hermanos Meléndez, Inc.*, 253 F. Supp. 2d 179, 198 (D.P.R. 2003) ("A hospital violates its duty to stabilize under EMTALA when it fails to stabilize a patient before transferring or discharging him or her."); *Torres-Otero v. Hosp. General Menonita, Inc.*, 115 F. Supp. 2d 253, 260 (D.P.R. 2000) ("[T]he duty to stabilize exists not in a vacuum, but rather in reference to a transfer of the patient from the hospital.").

As such, contrary to the duty to screen, the duty to stabilize applies "regardless of how that person enters the institution or where within the walls he may be" when the hospital determines that the patient is suffering an emergency condition. *López-Soto v. Hawayek, M.D.*, 175 F.3d 170, 173 (1st Cir. 1999). Further, to determine whether a patient was stabilized prior to being transferred, the court "must consider whether the medical treatment and subsequent release were reasonable in view of the circumstances that existed at the time the hospital discharged or transferred the individual." *Marrero*, 253 F. Supp. 2d at 179 (quoting *Torres-Otero*, 115 F. Supp. 2d at 259). This analysis focuses not "on the result of the plaintiff's condition after the release, but rather on whether the hospital would have considered another patient in the same condition as too unstable to warrant his or her release or transfer." *Torres-Otero*, 115 F. Supp. 2d at 260-61. Thus, "[t]he stabilization obligation does not impose a standard of care prescribing how physicians must treat a critical patient's condition while he remains in the hospital, but merely prescribes a precondition the hospital must satisfy before it may undertake to transfer the patient to another hospital." *Fraticelli-Torres v. Hosp. Hermanos*, 300 Fed. Appx. at 4.

Specifically, defendants argue dismissal is proper because Corchado was admitted to defendant Hospital Cayetano Coll y Toste's emergency room and received medical care,

including X-rays, IV fluids, laboratory tests, wound closure and the placement of a posterior cast to immobilize the left leg and in order to stabilize his condition. Further, defendants contend that, since at the time, there were no on-call orthopedic surgeons available at the hospital to tend to orthopedic emergencies and considering that the Puerto Rico Medical Center is the only level one trauma center in Puerto Rico, Corchado was transferred to Puerto Rico Medical Center for further specialized treatment for his condition. **Docket No. 61-16** at 10-2. Defendants aver that Corchado's condition was essentially the same when he left their hospital as when he arrived; thus, defendants complied with EMTALA's stabilization and transfer requirements. *Id.* Plaintiffs, on the other hand, assert defendants did not stabilize Corchado and this failure caused his condition to deteriorate, thus violating EMTALA's duty to stabilize prior to a transfer. **Docket No. 65,** at 9.

After careful perscrutation of the record and parties' briefs, the court agrees with defendants. It remains undisputed that Corchado was admitted in the emergency room of Hospital Cayetano Coll y Toste with an emergency medical condition. It is further uncontested that, after Corchado was triaged, screened, examined and treated by Dr. Ramírez, Dr. Ramírez recommended he be transferred to Puerto Rico Medical Center to receive specialized orthopedic care that was unavailable at Hospital Cayetano Coll y Toste. However, the record, as it stands, does not point to any evidence or material issue of fact to sustain that Corchado's condition was unstable at the time of transfer or that any material deterioration resulted from or occurred during the transfer. Actually, the medical records at the time the patient was transferred from Hospital Cayetano Coll y Toste and medical record at Puerto Rico Medical Center upon arrival clearly denotes the patient was stable when released, while transported to and upon arrival at Puerto Rico Medical Center.

"The stabilization provision requires a covered hospital, within its staff and facilities, to provide an individual it determines has an emergency medical condition with "such further medical examination and such treatment as may be required to stabilize the medical

condition." 42 U.S.C. § 1395dd(b)(1)(A). EMTALA defines "to stabilize" as "to provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility." *Id.* § 1395dd(e)(3)(A)." *Álvarez-Torres*, 582 F. 3d at 52 (emphasis omitted). The undisputed facts establish that, upon transfer from Hospital Cayetano Coll y Toste on June 5, 2006, Corchado arrived at the Puerto Rico Medical Center at approximately 5:30 a.m. in stable condition. Upon arrival, Corchado's vital signs were T36.3°C, P 112, R 20, and BP 139/77; he was alert and oriented in person, space, place, and time. In fact, plaintiffs' own expert, Dr. Fernández-Barreras, testified in his deposition that Corchado's condition when he left Hospital Cayetano Coll y Toste and when he arrived Puerto Rico Medical Center was essentially the same. **Docket No. 61-14,** at 8-9. Further, Dr. Fernández also testified that there was no evidence of material deterioration of Corchado's condition during the transfer. *Id.*, at 12.

Although plaintiffs attest that Dr. Ramírez' decision to close the open wound on the patient's left leg, when there was evidence of fracture of the tibia and fibulae bones, was wrong and that defendants did not follow standard emergency department protocols for wound management, they have failed to present record evidence to support these assertions.[1] The sole exhibit plaintiffs submit to contest summary judgment is presumably Dr. Fernández-Barreras' report, (Exhibit 1 of plaintiffs' opposition). *See* **Docket No 65-1**. However, this report lacks fundamental criteria for the exhibit to be deemed as admissible evidence. For instance, the report has not been properly authenticated under the Federal Rules of Civil Procedure and lacks the doctor's signature and medical license number. Thus, failure to properly authenticate this exhibit precludes this court's consideration of the same at this stage

---

[1] Plaintiffs have not presented any evidence as to what specific protocols were breached with Dr. Ramirez' actions, nor have plaintiffs brought to the court's attention any specific directive in defendants' protocols on wound management to counter the hospital's assertion that Corchado was stabilized.

and renders the report inadmissable.[2]  Notwithstanding, even if the court were to have considered the report, the same centers on the premise that defendants deviated from the acceptable standards of care that should have been afforded to Corchado, which constitutes a medical malpractice claim.  As will be discussed in more detail below, medical malpractice claims fall outside EMTALA's limited realm.

In addition, plaintiffs' opposition to summary judgment centers on the contention that Dr. Ramírez' actions deviated from the standard of medical care that should have been afforded to Corchado and is medical malpractice.  For instance, plaintiffs highlight that Dr. Ramírez' decision to close the open wound contributed to the patient's necrosis and amputation, stating: "This is clearly medical malpractice" (**Docket No. 65**, at 9) and that Dr. Ramírez ordered a posterior cast after the closure of the wound which is "clear-cut medical malpractice and a deviation of the standard protocols for the treatment of this type of injury at an Emergency Department, thus a violation of EMTALA", and that Dr. Ramírez actions "constitute both deviations from the accepted medical standards for the practice of medicine and, thus medical malpractice" (**Docket No. 65**, at 10).  However, "[t]he duty to stabilize under EMTALA does not impose a standard of care prescribing how physicians must treat a critical patient's condition while he remains in the hospital, but merely prescribes a precondition the hospital must satisfy before it may undertake a transfer the patient." *Álvarez-*

---

[2] In order for exhibits to be admissible during the summary judgment stage, these must be authenticated by and attached to an affidavit or unsworn statement under penalty of perjury that meets the requirements of Rule 56(e).  *See* 10A Wright, Miller & Kane, Federal Practice & Procedure § 2722 (3d ed.1998).  "Under Federal Rule of Civil Procedure 56(e), on summary judgment, the parties in their supporting affidavits shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." *Hoffman v. Applicators Sales And Service, Inc.,* 439 F.3d 9, 14 (1st Cir. 2006)(internal citations and quotations omitted) Moreover, "[s]worn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith." *Id.*  Failure to properly authenticate the supporting documents precludes the court's consideration of the same.  *See Carmona v. Toledo*, 215 F.3d 124, 131 (1st Cir. 2000)(holding that the documents supporting a motion for summary judgment could not be considered because they had not been properly authenticated).

*Torres*, 582 F.3d at 51 (quotations and citations omitted). Therefore, despite plaintiffs' framing of its claims as violations to EMTALA's stabilization requirements, their principal complaints and arguments stem from a medical malpractice perspective, based on their assertion that defendants deviated from the acceptable standards of medical care and that the same caused the eventual amputation of Corchado's left leg.

As the First Circuit has made abundantly clear, medical malpractice claims fall outside of EMTALA's providence. *Álvarez-Torres*, 582 F.3d at 52 ("EMTALA is a limited anti-dumping statute, not a federal malpractice statute.")(internal quotations and citations omitted); *Del Carmen Guadalupe*, 299 F. 3d at 21("EMTALA does not create a cause of action for medical malpractice..."). "Congress did not intend EMTALA to supplant existing state-law medical malpractice liability with a federal malpractice standard of care; the minimal screening and stabilization requirements were designed solely to prevent the specific injury of patient 'dumping,' which state malpractice law often could not redress." *Fratticelli- Torres*, 300 Fed. Appx. at 3-4.. In light of the above, the court finds that defendants complied with EMTALA's stabilization requirements; plaintiffs' claims are more adequately entertained and addressed under the Commonwealth's medical malpractice statutes.

## VI.     Supplemental Jurisdiction

Since the federal claims have been dismissed against the appearing defendants[3] and no other grounds for jurisdiction exists, the court declines to exercise supplemental jurisdiction over plaintiffs' remaining state law claims. *See Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 349 (1988) (explaining that the exercise of pendent jurisdiction is a matter of the federal court's discretion and not one of plaintiff's rights); *United Mine Workers v. Gibbs*, 383 U.S. 715, 725 (1966) (stating "if the federal claims are dismissed before trial, . . . the state law claims should be dismissed as well."). Accordingly, plaintiffs' claims brought pursuant to

---

[3] EMTALA violations are not claimed against the remaining co-defendants, *to wit*: Emergency Medicine Group of Arecibo, Inc., Dr. Héctor Ramírez, or their respective insurance providers. The claims against these co-defendants arise solely from Commonwealth law. **Docket No. 32**, at ¶¶ 37-44.

Commonwealth law are **DISMISSED WITHOUT PREJUDICE**.

## VII.  Conclusion

Based on the foregoing, the court **GRANTS** defendants' motion for summary judgment (**Docket No. 61**).  The EMTALA claims against Hospital Cayetano Coll y Toste and Continental Casualty Company, Inc. are hereby **DISMISSED WITH PREJUDICE**; plaintiffs' Commonwealth law claims against all defendants are **DISMISSED WITHOUT PREJUDICE.**

**SO ORDERED.**

At San Juan, Puerto Rico, this 25th day of August 2010.

**S/AIDA M. DELGADO-COLON**
**United States District Judge**